UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROBERTO ANTONIO CABRERA
MARTINEZ,

                Petitioner,

     v.

TAMMY MARICH et al.,[1]

              Respondents.

_____

          25-CV-1110-LJV
          DECISION & ORDER

      When noncitizens come to the United States without a valid visa or other

authority and are stopped at or near the border, they typically are taken into custody

under 8 U.S.C. § 1225(b).  Once in custody, they may be deported immediately under a

process known as "expedited removal," or they may be detained pending more fulsome

deportation proceedings.  *See Jennings v. Rodriguez*, 583 U.S. 281, 287-88 (2018).

Under section 1225, detention is mandatory and noncitizens cannot be released

pending deportation proceedings, expedited or otherwise.  *See id.*

      But there is one exception: in the discretion of the executive branch, noncitizens

subject to mandatory detention under section 1225 can nonetheless be paroled into the

_____

    [1] The petition named three respondents:  Edward Newman, Acting Director of
Buffalo Field Office of Immigration and Customs Enforcement; Kristi Noem, Secretary of
the Department of Homeland Security; and Pamela Bondi, Attorney General.  Docket
Item 1 at ¶¶ 19-21.  In its motion to dismiss, the government noted that Tammy Marich
is now "the Field Office Director for the Buffalo Field Office."  Docket Item 8 at 1 n.1.
Therefore, under Federal Rule of Civil Procedure 25(d), Marich is automatically
substituted for Newman as a respondent, and the Clerk of the Court shall update the
case caption accordingly.  *See* Fed. R. Civ. P. 25(d).  For ease of reference, the Court
will refer to the respondents as "the government" throughout this decision and order.

United States for a temporary stay.  8 U.S.C. § 1182(d)(5)(A); *see Jennings*, 583 U.S. at 288.  If the noncitizen is granted parole, then a "legal fiction" deems the person to remain at or near the border.  *Henderson v. I.N.S.*, 157 F.3d 106, 111 n.5 (2d Cir. 1998); *see Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020).

When noncitizens without authority or permission to be in the United States—for example, those who sneak into the country—are found someplace other than near the border, on the other hand, they are taken into custody under 8 U.S.C. § 1226.  *See Jennings*, 583 U.S. at 288, 303; *see also Alvarez Ortiz v. Freden*, --- F. Supp.3d ---, 2025 WL 3085032, at *2, *5-10 (W.D.N.Y. Nov. 4, 2025) (this Court's analyzing the text of 8 U.S.C. § 1225(b)(2) and finding that it "does not apply to individuals . . . who are physically in the country [and not on parole] but have not been legally admitted and seek to stay").  Unlike noncitizens held under the mandatory detention of section 1225, noncitizens held under section 1226 are given bond hearings to determine whether they might be safely released while their deportation proceedings are pending.  *See Jennings*, 583 U.S. at 306.

This case presents a dilemma: what happens when a noncitizen who has been granted parole for a discrete period of time remains in the country after that parole expires?  Does the legal fiction of parole deem the noncitizen to be at or near the border even when he or she is found in the middle of the country—that is, nowhere near any border—months or years later?  Or does the fact that the noncitizen was found in the United States after his or her parole expired—that is, without authority or permission somewhere other than the border—make the case akin to that of a noncitizen who has snuck into the country?  Put another way, are noncitizens who have overstayed their

welcome more like those stopped at the border or those who snuck in without permission?

That question is one of statutory interpretation:  What statute governs the detention of a noncitizen who was paroled into the United States, remained in the country after parole expired, and then was apprehended some time later?  Primarily at issue is the statute governing parole, which states:

> The Secretary of Homeland Security may . . . in h[er] discretion parole into the United States temporarily under such conditions as [s]he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served *the alien shall forthwith return or be returned to the custody from which he was paroled* and thereafter his case shall *continue to be dealt with in the same manner as that of any other applicant for admission to the United States*.

8 U.S.C. § 1182(d)(5)(A) (emphasis added).  So there are two phrases the Court must interpret:  What does it mean to "be returned to the custody from which [the noncitizen] was paroled"?  And what does it mean for the noncitizen's case to "continue to be dealt with in the same manner as that of any other applicant for admission to the United States"?

For the reasons that follow, this Court finds that "the custody from which [the noncitizen] was paroled" simply means custody of the United States Department of Homeland Security ("DHS"),[2] not custody under a specific statute.  And the Court further finds that for any noncitizen who is found in the United States unlawfully, to continue to

---

[2] "DHS is the umbrella agency under which both [United States Immigration and Customs Enforcement ('ICE')] and [United States Customs and Border Protection ('CBP')] are subsumed."  *See Fams. for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 382 n.7 (S.D.N.Y. 2011).

deal with the noncitizen's case "in the same manner as that of any other applicant for admission to the United States" means that detention is governed—like that for any other noncitizen found unlawfully present inside the country—by 8 U.S.C. § 1226.

## BACKGROUND[3]

The petitioner, Roberto Antonio Cabrera Martinez, is a Nicaraguan national. Docket Item 1 at ¶ 16; Docket Item 8-1 at 5. On March 3, 2023, he was paroled into the United States for a period of two years. Docket Item 1 at ¶ 23; *see* Docket Item 8-1 at 5 ("The parole program under which [Cabrera] Martinez entered the United States explicitly stated that parole would be for a two[-]year period, after which removal proceedings would be initiated against [him]." (citing Docket Item 7 at 2-3)).

A year-and-a-half later, on December 17, 2024, Cabrera Martinez "filed a joint asylum application with his spouse based on political persecution in Nicaragua." Docket Item 1 at ¶ 24. "They feared imprisonment upon return," they said, "as they were included in the Ministry of Exterior's list of 'traitors.'" *Id.* A few months later, on March 3, 2025, Cabrera Martinez's parole expired. *See id.* at ¶ 23.

On March 29, 2025, DHS sent Cabrera Marinez a letter stating:

Effective March 25, 2025, [DHS] has exercised its discretion to terminate the categorical parole programs for aliens who are nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members. Your parole will terminate upon the earlier of (1) your original parole expiration date or (2) April 24, 2025. You should depart the United States now, but no

---

[3] The Court takes the facts from the petition, Docket Item 1, and the government's motion to dismiss, Docket Item 8-1. The Court acknowledges that due to the expedited briefing schedule, the government has not yet been able to obtain the alien file for the petitioner. *See id.* at 5 n.2. The government assumed the facts alleged in the petition for purposes of its motion to dismiss but did not admit those facts. *See id.*

later than the date of the termination of your parole.  Failure to timely depart
may have adverse immigration consequences.

Docket Item 11-1 at 3.  The letter further warned:

If you have not obtained a lawful basis to remain in the United States and
do not depart the United States by the date your parole terminates, you will
begin to accrue unlawful presence in the United States unless you are
otherwise protected from such accrual.  Accrual of more than 180 days of
unlawful presence followed by departure from the United States may result
in being inadmissible if you again seek admission within a certain period of
time after departure.

*Id.*  Cabrera Martinez did not depart, and it appears that the government took no further

action until about five months passed—on October 1, 2025—when Cabrera Martinez

received an employment authorization document ("EAD") based on his pending asylum

application.  *See* Docket Item 1 at ¶ 25.

But only three weeks later, on October 25, agents from Immigration and Customs

Enforcement ("ICE") arrested Cabrera Martinez and took him into custody.  *Id.* at ¶ 26.

Five days after that, he filed this petition for a writ of habeas corpus under 28 U.S.C. §

2241.  Docket Item 1.  And about a week later, he moved for a preliminary injunction in

connection with his habeas petition.  Docket Item 7.

The government then responded and moved to dismiss the petition, Docket Item

8, and this Court heard oral argument and ordered supplemental briefing.  *See* Docket

Item 13.  After the parties filed their supplemental submissions, Docket Items 10, 11, 12,

15, 17, and 18, this Court again heard oral argument, *see* Docket Item 20.  At the

Court's request, the parties filed additional briefing.  *See* Docket Items 21, 22, and 23.

For the reasons that follow, after careful consideration of all the submissions and

arguments, this Court grants Cabrera Martinez's motion for a preliminary injunction,

orders the government to provide him with a prompt bond hearing, and denies the government's motion to dismiss.

## LEGAL PRINCIPLES

### I.    PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the court's] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021).

"The district court has wide discretion in determining whether to grant a preliminary injunction." *Valenzuela Arias*, 612 F. Supp. 3d 307, 311 (S.D.N.Y. 2020) (quoting *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (per curiam)). That being said, "[a] preliminary injunction is an extraordinary remedy," *Winter*, 555 U.S. at 24, and "should not be routinely granted," *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (quoting *Med. Soc. of State of N.Y. v. Toia*, 560 F.2d 535, 537 (2d Cir. 1977)). And "[w]hen deciding whether to issue a preliminary injunction, courts 'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *We The Patriots USA, Inc.*, 17 F.4th at 279 (quoting *Winter*, 555 U.S. at 24).

## II.    SECTION 2241 PETITION

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). "When a petitioner brings a habeas petition [under section] 2241, the petitioner 'bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence.'" *Dzhabrailov v. Decker*, 2020 WL 2731966, at *3 (S.D.N.Y. May 26, 2020) (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)). "The equitable principles governing [section] 2241 are reflected in the plenary discretion vested in habeas courts to 'hear and determine the facts, and dispose of the matter as law and justice require.'" *Id.* (alterations omitted) (quoting *Pinkney v. Keane*, 920 F.2d 1090, 1093 (2d Cir. 1990)).

## III.    MOTION TO DISMISS

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

**DISCUSSION**

**I.    STATUTORY FRAMEWORK**

As explained above, the question in this case is whether Cabrera Martinez is

being detained under 8 U.S.C. § 1225 or 8 U.S.C. § 1226 after having been paroled into

the country under 8 U.S.C. § 1182—all sections of the Immigration and Nationality Act

("INA").  The Court will begin by outlining each of these statutes.

**A.    Section 1225**

Section 1225 is titled "Inspection by immigration officers; expedited removal of

inadmissible arriving aliens; referral for hearing."[4]  8 U.S.C. § 1225.  Under this section,

a noncitizen "who 'arrives in the United States,' or 'is present' in this country but 'has not

been admitted,' is treated as 'an applicant for admission.'"  *Jennings*, 583 U.S. at 287

(quoting 8 U.S.C. § 1225(a)(1)).  "Section 1225(b)(1) applies to [noncitizens] initially

determined to be inadmissible due to fraud, misrepresentation, or lack of valid

documentation," as well as "to certain other [noncitizens] designated by the Attorney

General in h[er] discretion."  *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(iii)).

Noncitizens "covered by [section] 1225(b)(1) are normally ordered removed

'without further hearing or review' pursuant to an expedited removal process."  *Id.* (citing

8 U.S.C. § 1225(b)(1)(A)(i)).  But if a noncitizen covered by section 1225(b)(1)

"'indicates either an intention to apply for asylum . . .  or a fear of persecution,' then that

[person] is referred for an asylum interview."  *Id.* (quoting 8 U.S.C. § 1225(b)(1)(A)(ii)).

---

[4] The INA defines the term "alien" as meaning "any person not a citizen or
national of the United States."  8 U.S.C. § 1101(a)(3).  This Court uses "alien" and
"noncitizen" interchangeably throughout this decision and order.

In that case, the noncitizen "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."  8 U.S.C. § 1225(b)(1)(B)(iii)(IV).  And "[i]f an immigration officer determines after that interview that the [noncitizen] has a credible fear of persecution, 'the [noncitizen] shall be detained for further consideration of the application for asylum.'"  *Jennings*, 583 U.S. at 287 (quoting 8 U.S.C. § 1225(b)(1)(B)(ii)).

Section 1225(b)(2) covers "[i]nspection of other aliens" and provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A).  In other words, whereas for section 1225(b)(1) to apply, the immigration officer must definitively determine that the noncitizen "is inadmissible," for section 1225(b)(2) to apply, the immigration official need only determine that the noncitizen "is not clearly and beyond a doubt entitled to be admitted." *See id.* §§ 1225(b)(1)(A)(i), (b)(2)(A).  The Supreme Court has described section 1225(b)(2) "as a catchall provision that applies to all applicants for admission not covered by [section] 1225(b)(1)."  *See Jennings*, 583 U.S. at 287.

### B.    Section 1182

The only exception to the mandatory detention required by section 1225(b) is that "applicants for admission may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit.'"  *Id.* at 288 (quoting 8 U.S.C. § 1182(d)(5)(A)).  "Such parole, however, 'shall not be regarded as an admission of the alien.'"  *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)).  As explained above, when parole ends,

section 1182 provides that "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  8 U.S.C. § 1182(d)(5)(A).

### C.    Section 1226

Section 1226 is titled "Apprehension and detention of aliens."  8 U.S.C. § 1226. It states that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  *Id.* § 1226(a).  It further provides that:

[e]xcept as provided in subsection (c) and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

*Id.*[5]

---

[5] Section 1226(c)—which the parties agree does not apply here—deals with the "[d]etention of criminal aliens" and provides that "[t]he Attorney General shall take into custody any alien who" has committed certain crimes.  *See* 8 U.S.C. § 1226(c).

## II.    AUTHORITY FOR CABRERA MARTINEZ'S DETENION

With that backdrop in mind, the Court turns to the question at hand: what is the statutory authority for Cabrera Martinez's detention?

The government says that Cabrera Martinez "is inarguably an arriving alien and applicant for admission who has never been inside the United States except through parole, and thus he is detained pursuant to 8 U.S.C. § 1225(b)(2)." *See* Docket Item 15 at 3.  As explained above, section 1225(b)(2) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A).  Cabrera Martinez counters that when he was arrested and detained in October 2025, he was not "seeking admission"; on the contrary, he says, he already was here and had been for several years, including several months after his parole expired.  *See generally* Docket Item 12.

There is little question that when Cabrera Martinez first arrived at the border in March 2023, he was "seeking admission."  He then was paroled into the country, which allowed him to remain here under parole's "entry fiction."  *See, e.g.*, *Campbell v. Almodovar*, 2025 WL 3538351, at *8 (S.D.N.Y. Dec. 10, 2025); *Bermudez Paiz v. Decker*, 2018 WL 6928794, at *10 (S.D.N.Y. Dec. 27, 2018).  As explained above, despite being physically in the country, individuals on parole continue to be treated for legal purposes "as if stopped at the border."  *See Thuraissigiam*, 591 U.S. at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)); *Henderson,* 157 F.3d at 111 n.5 (describing parole as "a legal fiction").

11

The harder question—on which there is not yet any binding authority—is what happens to the "entry fiction" after parole ends?  Put another way, once a previously paroled noncitizen has been living in the United States *outside* parole for a period of time, what is the person's status?

The Court turns first to the statutory text.  As noted above, section 1182 mandates that when parole ends, "the alien shall forthwith return or be returned to the custody from which he was paroled," and "his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  8 U.S.C. § 1182(d)(5)(A).  There has been a flurry of recent district court decisions addressing the meaning of this provision, and courts have gone both ways on whether "returned to the custody from which [the noncitizen] was paroled" means custody under a specific statutory provision or simply DHS custody.  *Compare Tenemasa-Lema v. Hyde*, --- F. Supp.3d ---, 2025 WL 3280555, at *4 (D. Mass. Nov. 25, 2025) (finding that "because DHS's statutory power to 'return' [p]etitioner to custody under section 1225 at the expiration of his parole, *see* 8 U.S.C. § 1182(d)(5)(A), was not lost through DHS's inaction, that remains a proper authority for his current detention"), *and Chanaguano Caiza v. Scott*, 2025 WL 3013081, at *7 (D. Me. Oct. 28, 2025) (concluding that petitioner "was initially detained [under section] 1225(b)(2) and therefore, upon expiration of his parole, his status is restored to detention under that same statute"), *with, e.g.*, *Campbell v. Almodovar*, 2025 WL 3538351, at *9 (S.D.N.Y. Dec. 10, 2025) ("In accordance with that understanding, [s]ection 1182(d)(5)(A) permitted DHS to 'return [peititioner] . . . to the custody from which he was paroled,' but not without the procedures afforded to any other applicant for admission residing in the United States

for years."); *Rodriguez v. Rokosky*, 2025 WL 3485628, at *2 (D.N.J. Dec. 3, 2025) (section 1182 "provides only that, upon expiration of parole, the individual 'shall . . . return . . . to the custody from which he was paroled' and that 'his case shall continue to be dealt with in the same manner as that of any other applicant for admission,' i.e., any ordinary noncitizen present in the United States without admission" (emphasis omitted)); *Rodriguez-Acurio v. Almodovar*, --- F.Supp.3d ---, 2025 WL 3314420, at *18 (E.D.N.Y. Nov. 28, 2025) (concluding that "[s]ection 1182(d)(5)(A) may permit [the petitioner] to be returned to [DHS] custody, but her case, which necessarily includes the procedures required before detention, 'shall continue to be dealt with in the same manner as that of any other applicant for admission,' 8 U.S.C. § 1182(d)(5)(A), and any other applicant for admission residing in the United States for more than three years would be detained under [s]ection 1226"). The weight of authority in this Circuit follows the latter approach, and for the reasons that follow, so does this Court.

## A.    Supreme Court Guidance

As Judge Choudhury recognized in *Rodriguez-Acurio*, 2025 WL 3314420 at *18, the Supreme Court's decision in *Clark v. Martinez*, 543 U.S. 371, 385 (2005), is instructive. *Clark* dealt with two Cubans who arrived in the Mariel boat lift, later violated their parole, and then were ordered removed. 543 U.S. at 374-75. The question was whether the Supreme Court's interpretation of 8 U.S.C. § 1231 in *Zadvydas v. Davis*, 533 U.S. 678 (2001), applied to them. *See Clark*, 543 U.S. at 373. Among other arguments, "the [g]overnment sought to justify its continued detention of these aliens on the authority of [section] 1182(d)(5)(A)." *Id.* at 385. The Supreme Court rejected that contention and explained:

> Even assuming that an alien who is subject to a final order of removal is an "alien applying for admission" and therefore eligible for parole under this provision, we find nothing in this text that affirmatively authorizes detention, much less indefinite detention. To the contrary, it provides that, when parole is revoked, "the alien shall . . . be returned to the custody from which he was paroled and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission.*"    [8 U.S.C. § 1182(d)(5)(A)] (emphasis added). The manner in which the case of any other applicant would be "dealt with" beyond the 90-day removal period is prescribed by [section] 1231(a)(6), which we interpreted in *Zadvydas* and have interpreted above.

*Clark*, 543 U.S. at 385-86.

The Supreme Court's interpretation of section 1182 suggests that "custody" does not mean custody under specific statutory authority; rather, it simply means the custody of DHS. If, as the government argues here, "custody" in section 1182 meant custody under section 1225, then the Cubans in *Clark* would have been returned to custody under section 1225, not section 1231. And what is more, *Clark* confirmed that "[t]he manner in which the case of any other applicant would be 'dealt with'" under section 1182 includes the rights and procedures that pertain to detention. *See* 543 U.S. at 385-86.

Based on the Supreme Court's reading of the statutory text, Judge Choudhury found that "[s]ection 1182(d)(5)(A) may permit [the petitioner] to be returned to [DHS] custody, but her case, which necessarily includes the procedures required before detention, 'shall continue to be dealt with in the same manner as that of any other applicant for admission,' 8 U.S.C. § 1182(d)(5)(A)." *Rodriguez-Acurio*, 2025 WL 3314420, at *18. Therefore, and because "any other applicant for admission residing in the United States for more than three years would be detained under [s]ection 1226," Judge Choudhury concluded that the previously paroled noncitizen also would be held under that section. *See id.* This Court agrees.

**B.    "Unlawful Presence"**

Further support for the idea that the "entry fiction" ends once a person has been living in the country after parole expires can be found in another part of section 1182: subsection (a)(9)(B)(ii) addressing "unlawful presence." That subsection provides that "an alien is deemed to be unlawfully *present* in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii) (emphasis added). So the "entry fiction"—which deems someone on parole not to be legally "present" in the country—must end when someone overstays "the period of [parole] authorized by the Attorney General." *See id.* Section 1182(a)(9)(B)(ii) says as much.

Indeed, the letter sent to Cabrera Martinez cautioned that "[i]f you have not obtained a lawful basis to remain in the United States and do not depart the United States by the date your parole terminates, you will begin to accrue unlawful *presence* in the United States unless you are otherwise protected from such accrual." Docket Item 11-1 at 3 (emphasis added). And the government acknowledged in its briefing that Cabrera "was actually accruing time of unlawful *presence* which may bar his future admissibility." Docket Item 15 at 4 (emphasis added). It defies logic to deem someone simultaneously awaiting entry "at the border" and "present" inside the country.

Thus, based both on the text of section 1182 and the Supreme Court's interpretation of it in *Clark*, this Court finds that "returned to the custody from which [the

noncitizen] was paroled" in section 1182 refers simply to DHS custody.[6]  And for someone who is "unlawfully present" because his parole has expired and he has been living in the country without parole for a period of time,[7] that person's detention must "be dealt with in the same manner as" any other noncitizen "already present in the United States," *see Jennings*, 583 U.S. at 303—that is, under section 1226.[8]

### C.    The Government's Caselaw

The cases the government cites do not compel a different conclusion.  Indeed, most of the cases upon which the government relies hold that being paroled into the

---

[6] As Judge Murphy observed, any delay in returning the petitioner to custody under section 1182 does not extinguish DHS's right to do.  *See Tenemasa-Lema*, 2025 WL 3280555, at *3.  The Supreme Court has held that "an official's crucial duties are better carried out late than never," *Nielsen v. Preap*, 586 U.S. 392, 411 (2019), and "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction," *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003) (quoting *United States v. James Daniel Good Real Property,* 510 U.S. 43, 63 (1993)).

[7] As this Court observed during oral argument, there must come a time when the legal fiction that someone granted parole remains at the border comes to an end.  For example, deeming a noncitizen to still be at the border seeking admission when she has lived in this country since her parole expired 40 years ago would be fantasy, not fiction. The Court does not weigh in on how long the minimum period of time must be, but several months is certainly enough given the statutory language and the Supreme Court's reading of it.

[8] Cabrera Martinez also argues that the government does not have the authority to return him to custody under section 1182 because he "wasn't paroled from *any* custody.  He was invited to fly to the United States, vetted upon arrival, and permitted to enter."  Docket Item 22 at 3.  Not so.  First, although Cabrera Martinez may not have spent much time in custody while being "vetted," he must have been "in custody" at least for that initial screening.  *See* 8 U.S.C. 1225(b); *see also* Implementation of a Parole Process for Nicaraguans, 88 FR 1255-01 ("Each individual arriving at a [point of entry] under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.").  And even if that were not the case, DHS certainly would now have authority under section 1226(a) to detain him as a noncitizen unlawfully present.

country, or spending years here without any authority, does not entitle a noncitizen to any additional process in connection with an application to *enter* or *legally remain* here. This Court has no argument with that proposition, which addresses status in the country—a question over which the executive has virtually exclusive authority. But that says nothing about whether the noncitizen might be entitled to be released while the application is pending, an issue of liberty far different from immigration status. *See Campbell*, 2025 WL 3538351, at *8 (explaining that "the central concern of historic applications of the [entry fiction] doctrine was the admission or removal of a noncitizen, rather than detention pending an adjudication").

### 1.    Cases Involving Noncitizens Re-entering the Country

Several of the government's cases concern noncitizens detained when attempting to re-enter the country. For example, the government cites the Supreme Court's decision in *Mezei f*or the proposition "that even spending 25 years in the United States does not entitle an arriving alien [to] any more due process than an alien arriving at the United States border in the first instance." Docket Item 21 at 1 (citing *Mezei*, 345 U.S. at 213). But as the government acknowledges, in *Mezei*, the petitioner, after having lived here for many years, left and was detained at the border upon his return. *See Mezei*, 345 U.S. at 207, 213. He had been "permanently excluded from the United States on security grounds but [remained] stranded . . . on Ellis Island because other countries w[ould] not take him back." *Id.* at 207. So *Mezei* concerned the right to enter the country, not the right to be at liberty pending ongoing deportation proceedings.[9]

---

[9] What is more, *Mezei* was decided on due process grounds and did not deal with the precise statutory question here. Nor could it have, as it was decided well

Along the same lines, in *Abitih v. Wilkinson*, 2021 WL 733806 (W.D.N.Y. Feb. 25, 2021), Chief Judge Wolford of this District found that a "[p]etitioner who . . .  attempted to *re-enter* the United States" after his parole expired "was taken into custody" under section 1225(b).  *Id.* at \*1 (emphasis added).  In other words, the noncitizen in *Abitih* was literally stopped at the border and prevented from *entering* the country.

There is no question that had Cabrera Martinez left and presented himself again at the border, he would be an arriving alien under section 1225(b).  But that is not what happened here.

### 2.    Cases Demonstrating that a Noncitizen on Parole Remains Legally at the Border

The government also relies on several cases that stand for the well-established proposition that noncitizens on parole remain legally at the border.  *See, e.g.*, *Thuraissigiam*, 591 U.S. at 139 (noncitizens "paroled elsewhere in the country for years pending removal" are nonetheless legally "'treated . . . as if stopped at the border'" (quoting *Mezei*, 345 U.S. at 215)).

For example, the government cites *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958).  Docket Item 21 at 1-2.  There, the petitioner was

> a native of China who arrived in this country in May 1951 claiming United States citizenship on the ground that her father was a United States citizen. Pending determination of her claim, she at first was held in custody, but later, in August 1952, was released on parole.  Some three months thereafter, having failed to establish her claim of citizenship, she was ordered excluded, and the Board of Immigration Appeals affirmed.  She surrendered for deportation in January 1954, and thereafter applied for a stay of deportation under s[ection] 243(h) in which she alleged that her

_____

before the current regime, which went into place in 1996.  *See Henderson,* 157 F.3d at 111 n.5.

pending deportation to China would subject her to physical persecution and
probable death at the hands of the existing government.

*Leng May Ma*, 357 U.S. at 186.  Section 243(h) "authorize[d] the Attorney General 'to

withhold deportation of any alien within the United States to any country in which in his

opinion the alien would be subject to physical persec[u]tion.'"  *Id.* at 185.  The Supreme

Court found that under those circumstances, the petitioner's pending "parole did not

alter her status as an excluded alien or otherwise bring her 'within the United States' in

the meaning of s[ection] 243(h)."  *Id.* at 186.  So the petitioner had no greater right to

enter or legally remain in the country.  But *Leng May Ma* did not address what happens

when a noncitizen accrues time *inside* the country after parole expires.

The government also cites the Tenth Circuit's decision in *Sierra v. Immigration &

Naturalization Services*, 258 F.3d 1213 (10th Cir. 2001).  Docket Item 21 at 2-3.  There,

the petitioner was "a Cuban who came to the United States during the 1980 Mariel boat

lift" and "was paroled into the United States."  *Sierra*, 258 F.3d at 1215-16.  After

committing a series of crimes, he ultimately ordered was removed in 1992.  *Id.* at 1216.

But Cuba would not accept him back, so he remained detained in federal prison.  *Id*.

Under a process established in 8 C.F.R. § 212.12(g)(2), "Mariel Cubans who are being

detained have their cases reviewed every year to determine whether they should be

paroled" out of custody under section 1182.  *Sierra*, 258 F.3d at 1216.  The petitioner

"was denied parole in 1992," but "[i]n 1994, he was released."  *Id.*  Six months later,

however, "his parole was revoked . . . because he had violated its conditions," and "[h]e

was denied parole again in 1995, 1996, and 1997."  *Id.*  In 1998, the review board

"recommended that he be paroled," but "[b]ecause of [a] fighting incident and apparently

while [the petitioner]'s disciplinary appeal was pending, the [INS] Associate

Commissioner for Enforcement, without a hearing, withdrew approval for [the petitioner's] parole." *Id.*

The Tenth Circuit rejected the petitioner's arguments that "(1) he was entitled to a hearing on the parole withdrawal and (2) the Cuban Review Panel should not have withdrawn his parole while his appeal of the disciplinary decision was pending." *Id.*   But those arguments addressed whether the petitioner was entitled to be paroled into the United States—a decision that is entirely within the executive's discretion—not whether he could be released while immigration proceedings were pending.

In dicta, the Tenth Circuit also explained that "[a]lthough he has been physically present in the United States for more than twenty years," the petitioner "[wa]s 'legally considered to be detained at the border and hence as never having effected entry into this country.'" *Id.* at 1218 (quoting *Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir.), *amended by* 997 F.2d 1122 (5th Cir. 1993)).  But unlike this case, all the time that the petitioner in *Sierra* spent inside the country was either in detention or on parole. So the *Sierra* court did not have to grapple with the effect of unlawful presence after parole had expired.  Moreover, the petitioner in *Sierra* already had been ordered removed; he was not—like Cabrera Martinez—in detention pending removal proceedings that may ultimately conclude in his favor.

### 3.     The Second Circuit's Decision in *Ofosu v. McElroy*

The government cites *Ofosu v. McElroy*, 98 F.3d 694 (2d Cir. 1996), for the proposition "that no further due process was required prior to the government['s] taking [an] alien [whose parole has expired or was terminated] into custody."  *See* Docket Item

10 at 2.  Of course, this Court agrees with and follows that binding precedent.  But it does not answer the question here.

In *Ofosu*, the petitioner, who was on parole, had been ordered "excluded."[10]  98 F.3d at 697-98.  The government ordered him to appear, but he refused because he was worried that his parole would be revoked and that he would be detained pending his appeal to the Second Circuit.  *See id.*  He then sought a stay of the exclusion order.  *See id.*  The Second Circuit ultimately granted his request for a stay of the exclusion order but "conditioned [that stay] upon the petitioner's prompt surrender to the [Immigration and Naturalization Service ('INS')[11]] for possible parole revocation."  *Id.* at 696.

In reaching this conclusion, the Second Circuit looked to the language of section 1182: "[w]hen . . . parole is no longer warranted, 'the alien shall forthwith return . . . to the custody from which he was paroled.'"  *Id.* at 700 (quoting 8 U.S.C. § 1182(d)(5)(A)).  From this, the court concluded that the government "may demand at any time that the alien return to custody" and that "[t]here [wa]s simply no basis for [the petitioner]'s

---

[10] Prior to amendments to the INA in 1996, "the law distinguished between deportation and exclusion proceedings."  *Henderson*, 157 F.3d at 111 n.5.  "Aliens who were physically present in the United States were placed into deportation proceedings" whereas "[e]xclusion proceedings dealt with aliens who were literally at the border seeking entry as well as those who had been physically paroled into the country but who, through a legal fiction, remained for immigration purposes at the border."  *Id.*  "The 1996 law combined the two proceedings into a new process known as a 'removal proceeding.'"  *Id.*  So instead of being ordered "excluded," a noncitizen today would be ordered "removed."

[11] "Before 2002, immigration proceedings were conducted by [INS]."  *Funes v. Francis*, 2025 WL 3263896, at *3 n.4 (S.D.N.Y. Nov. 24, 2025).  "In 2002, after passage of the Homeland Security Act, removal authority was transferred from INS to [DHS], which came to include ICE."  *Id.* (citing *Ali v. Mukasey*, 524 F.3d 145, 150 (2d Cir. 2008)).

21

insistence that the [government] leap procedural hurdles to terminate parole or compel [his] appearance." *Id.* In other words, as this Court acknowledges, *see supra* notes 6 and 8, DHS has the authority to take someone back into custody once parole has ended.

But that does not answer the question of what happens once the person returns to custody. *Ofosu*—which, like *Mezei*, was decided under the prior statutory scheme— did not have occasion to decide whether section 1225 or 1226 applies to someone in Cabrera Martinez's situation who was arrested after living here without parole for some time. Therefore, while *Ofosu* certainly stands for the proposition that a noncitizen paroled into the country may be compelled to appear and taken into custody, it says nothing about whether that noncitizen is entitled to a hearing addressing whether continued detention is necessary while the noncitizen contests removal.

### 4.    Out-of-Circuit District Court Cases

The government cites several district court cases from outside this Circuit that support its position. For the reasons explained below, however, this Court respectfully declines to follow those decisions.

In *Elsaidy v. Rau*, 2010 WL 3222510 (D. Md. Aug. 16, 2010), for example, the court found that a noncitizen who had overstayed his parole still was an "arriving alien" under section 1225. *See id.* at *1. But in that case, the "[p]etitioner d[id] not contest that he [wa]s an arriving alien," so the court did not have the opportunity to consider the statutory arguments presented here. *See id.* Similarly, in *Ashraf v. United States Immigration & Customs Enforcement*, 2011 WL 1059712 (N.D. Ohio Mar. 21, 2011), the petitioner "recognized that as an arriving alien, the Immigration Court ha[d] no

22

jurisdiction over his custody determination in removal proceedings." *Id.* at *2.  The
district court therefore concluded that the "[p]etitioner [wa]s an arriving alien" and that
section "1225(b) authorize[d] the detention of arriving aliens."  *See id.*  Likewise, in
*Shehata v. United States Immigration & Customs Enforcement*, 2015 WL 145054 (S.D.
Ohio Jan. 12, 2015), the petitioner—whose parole had expired at some point prior to his
being detained—did not contest that he was an "arriving alien" under section 1225.  *See*
*id.* at *2-3 & *2 n.3.  He instead "argue[d] that his current detention without the
possibility of a bond hearing violate[d] his procedural due process rights because [his]
advance parole document did not provide sufficient *notice* of the adverse consequences
of departing the United States."  *See id.* at *3 (emphasis added).  So none of those
cases conducted any of the statutory analysis discussed above.

Another case that the government cites, *Gutierrez-Soto v. Sessions*, 317 F.
Supp. 3d 917 (W.D. Tex. 2018), dealt with a challenge to the revocation of parole.  In
that context, the court rejected the petitioners' argument—which it described as "fairly
novel"—that by "allowing them to live, work, and establish roots in America for nearly a
decade while on parole," the government gave "them a due process right to not be
snatched off the street without warning whenever [r]espondents see fit."  *Id.* at 929.
This Court disagrees with that court's blanket characterization of the law on revocation
of parole for the reasons stated in *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128
(W.D.N.Y. 2025).[12]  But more to the point here, *Guiterrez-Soto* did not address what
happens when a noncitizen remains in the country after parole has expired.

_____

[12] In *Mata Velasquez*, this Court concluded "that both common sense and the
words of the statute require parole revocation to be analyzed on a case-by-case basis
and that a decision to revoke parole must attend to the reasons an individual

The Court recognizes that two recent district court decisions in the First Circuit—
*Tenemasa-Lema*, 2025 WL 3280555, at *4, and *Chanaguano Caiza*, 2025 WL 3013081,
at *7—support the government's assertion that section 1225(b) remains the statutory
authority for detention of a noncitizen who was paroled into the country regardless of
how much time has passed since the expiration of parole.  But neither of those cases
grappled with the Supreme Court's analysis of the language in section 1182 discussed
above, *see Clark,* 543 U.S. at 385-86, nor did they address the plain language of
section 1182 providing that those who overstay their parole are deemed to be
"unlawfully *present*" in the United States, *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (emphasis
added).  Those decisions therefore have limited persuasive value here.

### D.    The Government's Other Arguments

The Court acknowledges that 8 C.F.R. § 1.2 supports the government's
argument.  That regulation provides that "[a]n arriving alien remains an arriving alien
even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole
is terminated or revoked."  And that gives this Court significant pause.  But for two
reasons, it does not change the Court's conclusion.

First, although the regulation says "even after any such parole is terminated or
revoked," it does not address whether that has any temporal or other limitation.  For
example, and as already noted, *see supra* note 7, it is hard to imagine that the legal

---

[noncitizen] received parole."  794 F. Supp. 3d at 146 (citation and internal quotation
marks omitted).  And the Court also found that "the circumstances of th[at] case"—in
which the petitioner was "invited here" under a two-year parole program for
Venezuelans—"require[d] some level of constitutional due process before parole c[ould]
be revoked."  *Id.* at 148.

fiction could apply to someone who has remained in the country without parole for decades.  And someone who left the country after parole expired, snuck back in illegally, and then was arrested in the heartland presumably would be treated as would any other individual who snuck into the country, not as an "arriving alien" under the regulation.

But even more importantly, "[t]he Court is interpretating a statute, not a regulation."  *See Qasemi v. Francis*, 2025 WL 3654098, at *7 (S.D.N.Y. Dec. 17, 2025). In 2024, the Supreme Court overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and held that "courts must exercise independent judgment in determining the meaning of statutory provisions" rather than deferring to agency interpretations when provisions are ambiguous.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024); *Romero v. Francis*, 2025 WL 3110459, at *3 (S.D.N.Y. Nov. 6, 2025) (explaining that "after *Loper Bright*, it is the province of the courts—not the agency—to 'authoritatively interpret' the statute" (quoting *Loper Bright*, 603 U.S. at 402)); *see also Rodriguez-Acurio*, 2025 WL 3314420, at *19-20 (rejecting argument that 8 C.F.R. § 1.2 is dispositive of definition of "arriving alien" after *Loper Bright*).  And based on the statutory text of section 1182 and the Supreme Court's interpretation of it, this Court finds that someone who has overstayed parole is "present" in the United States.

Finally, the government argues that it "does not make sense to allow someone to break the law and enter the United States, or to unlawfully remain in the United States, and then use the results of their unlawful activity to bolster their claim to remain."

Docket Item 21 at 5.  The Court appreciates that argument but ultimately finds it unpersuasive.

First, the question here does not relate to the petitioner's right "to remain" in the United States, which will be decided by the immigration courts.  Rather it relates to the possibility of liberty while immigration proceedings are pending, which "is the norm" in this country, whereas "detention 'is the carefully limited exception.'"  *See Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty." (citation and internal quotation marks omitted)).  What is more, it is up to Congress—not the courts—to weigh these types of equities in drafting statutes; it is up to the courts simply to interpret what Congress has written.[13]

And it also makes little sense to treat those who present themselves at the border, are given parole, and then overstay their welcome more harshly than those who simply sneak into the country without ever having had authority or permission to be here.  But under the government's interpretation of the law, those who initially played by

---

[13] This Court acknowledges that the Second Circuit in *Ofosu* expressed concern about the implications for the "the system of parole" if noncitizens on parole are allowed to flout government orders without consequence.  98 F.3d at 702 ("In ruling on this stay, we consider whether what we do will encourage others to respect their parole status. Justice will not be served if [the petitioner]'s non-cooperation is seen to be without cost by others similarly situated, and the system of parole thereby becomes infeasible.").  But there, the Second Circuit was determining whether to grant a discretionary stay—a decision for which it determined that "an alien's non-cooperation [wa]s a[n] important fact."  *See id.*  It was not interpreting the statutory language presented here, except to the extent that it—like this Court, *see supra* notes 6 and 8—found that section 1182 allows DHS to take someone back into custody following the expiration or termination of parole.  *See Ofosu*, 98 F.3d at 700.

the rules and were granted parole that expired must be detained while awaiting deportation proceedings; those who snuck in and never had permission to be here may be released after a hearing. So the point is not what makes the most sense. The point is what the law says, sensical or not.

### E.    Conclusion

For all those reasons, after careful consideration of this close question, this Court joins those courts that have found that an individual who has been living in the United States outside parole and is later apprehended is detained under section 1226. In reaching this conclusion, this Court need not—and does not—reach the question of the statutory authority for detention of individuals whose parole has ended but who were in fact "forthwith . . . returned to [DHS] custody," 8 U.S.C. § 1182(d)(5)(A), such that they did not accrue unlawful presence time, *see id.* § 1182(a)(9)(B)(ii). Several courts have suggested that such persons also would be detained under section 1226. *See, e.g.*, *Qasemi*, 2025 WL 3654098, at *9 (finding that "when ICE affirmatively chose to release [petitioner] on parole, it made the decision that he would no longer be subject to the mandatory detention provision of [s]ection 1225(b)(1), as is mandated by subsection (b)(1)(iii)(II)"); *Rodriguez-Acurio*, 2025 WL 3314420, at *18 (concluding that "the grant of humanitarian parole to [petitioner] moved her out of expedited removal proceedings and related mandatory detention [under section 1225(b)]"). This Court has serious doubts as to whether that conclusion can be squared with the extensive binding precedent on the entry fiction. But that is a question for another day. This Court's holding today addresses only those who have lived for some time within the country outside their period of parole.

27

## III.    PRELIMINARY INJUNCTION FACTORS

Based on its statutory analysis above, the Court finds that Cabrera Martinez is detained under section 1226(a)—under which he is entitled to a bond hearing—and that he therefore is likely to succeed on the merits of his habeas claim.  So that factor obviously weighs in his favor.  And having found that Cabrera Martinez is likely to succeed on the merits of his claim, this Court finds that the other two prongs of the preliminary injunction test are easily met.

First, there is no question that unlawful detention causes irreparable harm, and the government's argument to the contrary is deeply troubling.  *See* Docket Item 8-1 at 8 (arguing that Cabrera Martinez "cannot show irreparable harm due to his detention in immigration custody" because "[t]his is what Congress requires").  Certainly, the government's statement that detention is mandatory is relevant to its argument on the likelihood of success on the merits.  But for the government to argue that any person's detention does not cause irreparable harm deeply troubles this Court.

Likewise, there is little question that the balance of the equities and the public interest favor granting an injunction requiring a bond hearing under section 1226(a).  While the government has a strong interest in detaining noncitizens who are deemed to be a danger or a flight risk, there is no indication that this is the case with Cabrera Martinez; on the contrary, he was previously screened and paroled into the country, suggesting otherwise.  Moreover, if Cabrera Martinez is deemed by an immigration judge to be either a danger or a flight risk, the government may continue to detain him.  In other words, the government's interest in detaining Cabrera Martinez *without a bond hearing* is minimal.  On the other hand, every day that he is detained unnecessarily— and substantially—harms him.

## IV.    REMEDY

Having found that Cabrera Martinez is entitled to a preliminary injunction, the next question is the proper scope of that injunction. Or put another way, what is the appropriate remedy?

Cabrera Martinez argues that he should be ordered immediately released. *See generally* Docket Item 22. This Court acknowledges that other district courts have adopted that approach in similar cases, *see, e.g.*, *Qasemi*, 2025 WL 3654098, at *14; *Campbell*, 2025 WL 3538351, at *13; *Rodriguez-Acurio*, 2025 WL 3314420, at *32-33, and also recognizes that every day that Cabrera Martinez spends in detention is a hardship to him and his family. Ultimately, however, this Court finds—as it has previously—that a bond hearing rather than immediate release is the appropriate remedy. *See Alvarez Ortiz*, 2025 WL 3085032, at *11; *see also Romero v. Hyde*, 795 F. Supp. 3d 271, 288 (D. Mass. 2025) (noting that "the appropriate remedy will usually be a bond hearing to consider the merits of release under section 1226"); *Gomes v. Hyde*, --- F. Supp. 3d ---, 2025 WL 1869299, at *9 (D. Mass. July 7, 2025) (finding that "the appropriate remedy is to order the Immigration Court to conduct a new hearing at which it considers [the petitioner's] eligibility for bond under [s]ection 1226(a)").

The Court reaches this conclusion for several reasons. First, there is no question that DHS had the authority to take Cabrera Martinez into custody after his parole expired—even after some time has gone by. *See supra* notes 6 and 8. So to release him outright would likely overstep the bounds of this Court's power. Second, although Cabrera Martinez was vetted at the time he was paroled, this Court has no way of knowing whether anything has changed such that he now presents a danger or a flight risk; that determination is most appropriately made by an immigration judge. Third,

under section 1226(a), DHS is entitled to set a bond for a noncitizen's release, and this Court finds that forcing DHS to release Cabrera Martinez without setting a bond would be unfair.

For all those reasons, this Court orders a prompt bond hearing rather than Cabrera Martinez's immediate release.

## V.   PROCESS DUE

The final question is what process is due in connection with Cabrera Martinez's bond hearing.  Because this Court finds that Cabrera Martinez is being held under section 1226(a), it already has answered that question.  *See Alvarez Ortiz*, 2025 WL 3085032, at *12  ("After careful consideration and for the reasons that follow, this Court finds that constitutional due process requires the government to bear the burden of proving by clear and convincing evidence that the individual is either a danger to the community or a flight risk even at an initial bond hearing under section 1226(a).").  So for the reasons explained in *Alvarez Ortiz*, *see id.* at *12-15 (weighing factors set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976)), the Court reaches the same conclusion here.

## <u>CONCLUSION</u>

In sum, the Court finds that Cabrera Martinez is not subject to mandatory detention under 8 U.S.C. § 1225(b)(2) but instead is detained under section 1226(a). As a result, the Court DENIES the respondents' motion to dismiss, Docket Item 8, and finds that Cabrera Martinez is likely to succeed on the merits of his claim.  The Court further finds that Cabrera Martinez has established irreparable harm and that the

balance of the equities weighs in his favor.  Thus, the Court GRANTS his motion for a preliminary injunction, Docket Item 7.

More specifically, the Court ORDERS the respondents to provide Cabrera Martinez with an individualized bond hearing before an immigration judge **within seven calendar days of the date of this decision and order** at which the government shall bear the burden to demonstrate, by clear and convincing evidence, that he is a danger to the community or a flight risk.  At that bond hearing, the immigration judge must consider non-bond alternatives to detention or, if setting a bond, Cabrera Martinez's ability to pay.  If the respondents fail to provide such a hearing within seven calendar days, they shall immediately release Cabrera Martinez.

On or before **January 8, 2026**, the respondents shall (1) file a status report confirming that Cabrera Martinez either has been granted a bond hearing in compliance with this decision and order or has been released from custody, and (2) show cause why the petition should not be granted for the reasons explained in this decision and order.

SO ORDERED.

Dated:   December 31, 2025
         Buffalo, New York


                                      */s/ Lawrence J. Vilardo*
                                      LAWRENCE J. VILARDO
                                      UNITED STATES DISTRICT JUDGE